FRANK J. VALETTI AND SARAH J. VALETTI, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53007, 53008, 62270. Filed June 24, 1957.

Paul W. Knox, Esq., for the petitioners.
Jules I. Whitman, Esq., for the respondent.

694

OPINION.

RICE, *Judge:* The first issue raised in this proceeding is whether commissions, in whatever amount, paid by petitioner to officers of ships which he supplied were deductible as ordinary and necessary business expenses within the meaning of section 23 (a) (1) (A). Petitioner established by an overwhelming preponderance of the evidence that the payment of such commissions is a universal practice in his business, not only in the United States but throughout the world. The respondent has not argued that such payments contravene or frustrate any sharply defined national or State policy, and we are satisfied that the commissions paid to officers of ships, by chandlers who supply such ships, constitute an ordinary and necessary expense of their doing business. See *Lilly* v. *Commissioner*, 343 U. S. 90 (1952); Rev. Rul. 54–27, 1954–1 C. B. 44.

In addition to determining that such commissions did not constitute an ordinary and necessary business expense, the respondent disallowed the amounts claimed by the petitioner here on the ground that petitioner failed to prove that such amounts had been paid. In support of his argument that the commissions which he claimed on his returns were, in fact, paid, petitioner submitted summaries of the amounts of commissions paid in each of the years in issue based on the original vouchers which he had made at the time such commissions were allegedly paid. The respondent did not object to the introduction of the summaries as reflecting the information contained on the vouchers, but argued at the hearing, as he does on brief, that the vouchers themselves are not conclusive evidence that the payments which petitioner claims were actually made. He points out that the payments were made in cash, usually from the proceeds of

checks of substantial amounts, drawn from time to time on the company account, and turned over to the petitioner; and that the vouchers indicating a disbursement of such cash sums were made by petitioner in his own handwriting, and were not signed or receipted by the recipient of the payment. He therefore argues that because of the manner in which commission payments were handled, the petitioner could easily falsify vouchers, and by doing so withdraw substantial amounts of cash for his personal use under the guise that such amounts were commissions.

We think petitioner established that it was not customary in the trade for the recipients of commissions to sign a receipt for the amounts which they received; but, we agree with the respondent that the type of payments here involved and the manner in which they were made were easily open to flagrant abuse by a taxpayer bent on defrauding the Government. We appreciate, too, insofar as both a taxpayer whose records are challenged by the Government is concerned, and insofar as the Government is concerned in trying to show whether or not payments were actually made, that the only way proof of such payments could be conclusively established would be by the testimony of the recipients of the payments. Obviously, in a case such as this where the recipients are scattered all over the world, that is highly impracticable for both parties.

During the course of the hearing, the petitioner called, as witnesses, two ship chandlers from Norfolk, Virginia, and a representative of a firm engaged in ship repair work in the Philadelphia area who also paid commissions to ships' officers on the cost of such work. The testimony which those individuals gave, as the result of the respondent's cross-examination, clearly established that the customary commission paid by all chandlers everywhere is 5 per cent of the total sales made to ships. One of the witnesses testified that, under certain circumstances, as much as 10 or possibly 15 per cent might be paid to a captain, but that so large a payment was the unusual rather than the usual amount. The petitioner, himself, introduced certain letters in evidence which also indicated that the customary amount of a commission was 5 per cent. One such letter was from a chandler in Baltimore paying petitioner for merchandise delivered to a ship for its account, together with a payment for the commission given to the steward, which commission was less than 5 per cent of the bill for the merchandise. Another letter was from a shipowner, asking that petitioner refund the amount paid for a forge which had been returned, "discounting the 5% given by you to said Chief Engineer." Both of the aforementioned letters were written in 1949. Another letter, dated June 1, 1956, was addressed to petitioner from an Italian shipowner and referred to a proposed contract with petitioner to supply

its ships when they docked at Philadelphia. The owner asked if petitioner would grant discounts of "5% to be given to the crew (Cook or Chief Steward) on the amount of the invoice, at the moment of the supply" and "5% extra, in our favour." The amounts which petitioner claimed he paid out as commissions in 1948 and 1949 were over three times the customary rate; in 1950, they were over twice as much; and in 1951 almost twice as much. To have paid commissions averaging the percentage amounts claimed, petitioner, in 1949, for example, would have had to pay all officers at least 17.08 per cent on the amount of merchandise which they purchased, or some much more, and some less. There is no evidence indicating that any single commission paid by a chandler ever exceeded 15 per cent of the bill.

We appreciate the possible margin of error in determining deficiencies on the basis of percentages which supposedly reflect either profits or expenses of a business. See *Kurnick* v. *Commissioner*, 232 F. 2d 678 (C. A. 6, 1956), affirming T. C. Memo. 1955–31. But the evidence here of the normal percentage amounts paid by chandlers, as commissions, convinces us that petitioner did not pay the large amounts which he claimed. And we note that petitioner offered us no explanation as to why his commission payments were far out of line with others in his trade. The sum of all this is that we do not believe that petitioner made commission payments in excess of 7½ per cent of his gross sales and we, accordingly, so found.

The fraudulent intent of a taxpayer in filing his returns is a fact which the respondent must establish by clear and convincing evidence. It may not be presumed; it may not be merely a suspicion; it must be shown. Seldom can a showing of fraudulent intent be made by direct evidence. We think the facts here, however, come close to such showing.

Petitioner was a man of ability and obviously attended to his business with the care necessary to achieve the success evidenced by the amounts of income which he reported. He failed, however, to exercise a similar degree of care in dealing with the Government and, we think, purposely failed to meet the minimum standard demanded of every taxpayer to deal honestly and fairly with it. We think the respondent established by clear and convincing evidence that petitioner deliberately understated his income during each of the years in issue with the calculated intent of evading his tax liabilities.

In finding that the petitioner did not pay commissions in excess of 7½ per cent of his gross sales, we do not mean to suggest, as may often be true in cases of disputed expense payments, that the petitioner simply failed to prove that he made expenditures in excess of that amount. We think that the evidence here establishes that petitioner did not, in fact, make payments anywhere near the amounts

698

claimed on his returns for any of the years in issue. As we mentioned before, he offered no explanation which would justify the large commissions which he claims to have paid. Because of the manner in which he operated his business, it must follow that he alone was responsible for claiming deductions for payments which he knew had not been made. He, personally, made cash withdrawals from the business; he, personally, made out vouchers showing payments of commissions which he knew had not been made; he gave those vouchers to his bookkeeper and to his accountant who prepared the returns on which the amounts were claimed as deductions; and he signed and filed each return for the years in issue, knowing that it was not a "true, correct, and complete return" of his income. We are satisfied that he did so with the deliberate intention of reducing the amount of his tax liability by false and fraudulent means.

Since the returns for 1948 and 1949 were false or fraudulent with intent to evade tax, the statute of limitation is not a bar to the assessment and collection of the deficiencies determined for those years.

The petitioners offered no evidence establishing error in the respondent's determination of additions to tax for substantial underestimate of estimated tax, and such additions, where applicable upon a final computation of the deficiencies herein, are approved.

*Decisions will be entered under Rule 50.*