CARLOS BLANCA PEREZ, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Perez v. Commissioner
Docket No. 805-71.
United States Tax Court
T.C. Memo 1974-211; 1974 Tax Ct. Memo LEXIS 110; 33 T.C.M. (CCH) 946; T.C.M. (RIA) 74211; August 13, 1974, Filed. Sandor Frankel and Louis Bender, for the petitioners. Michael K. Phalin, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in petitioner's income tax as follows: Year
Deficiency
Additions to Tax for Fraud, Sec. 6653(b), I.R.C. 1954 1956
$9,148.17
$ 4,574.09
1957
4,667.25
2,754.12
1958
9,440.59
4,720.30
1959
9,255.14
4,627.57
1960
10,195.93
5,097.97
*111 At issue are: (1) whether petitioner's Federal income tax return for each of the years 1956 to 1960, inclusive, was "fraudulent * * * with the intent to evade tax" within the meaning of section 6501(c), I.R.C. 1954, such that assessment is not barred by the statute of limitations, and whether any portion of any underpayment for each of these years was due to fraud, such that the addition to tax provided for in section 6653(b) was properly imposed; (2) whether, notwithstanding the provisions of section 6501(c), the long period between the years at issue and the time of the trial herein has caused such substantial prejudice to petitioner as to violate his rights under the due process Clause of the Fifth Amendment to the United States Constitution; (3) the correctness of the Commissioner's action in including certain bank deposits in petitioner's taxable income for each of the years 1956 to 1960, inclusive; (4) the correctness of the Commissioner's action in disallowing in whole or in part certain business deductions claimed by petitioner for the years 1956 to 1960, inclusive; and (5) the correctness of the Commissioner's action in disallowing dependency exemptions claimed by petitioner *112 for his mother and sister for the years 1956, 1957, 1958 and 1959, and for his mother for 1960. These latter three issues will be reached only if the first two issues are decided in favor of the Commissioner; should either of the first two issues be decided in petitioner's favor for any of the years at issue, the entire deficiency, and any additions thereto, for that year or years must be disapproved. FINDINGS OF FACT The parties have filed a stipulation of facts which, together with accompanying exhibits, is incorporated herein by this reference. Petitioner Carlos Blanca Perez resided in New York City at the time of filing his petition herein. He filed his individual Federal income tax returns for 1956 to 1960, inclucive, with the district director of internal revenue in Manhattan, New York. In 1955 petitioner purchased a furniture "upholstering" repair business from George and Olga Kapfer. From 1956 to 1960, inclusive, he engaged in that business under the name of C.B.P. Kapfer Co. During this period the following seven corporations were customers of petitioner: 405 Furniture Corp., a subsidiary of London Terrace Inc. Apartment House Decorative Co., Inc. Hotel *113 Drake Corp. Hotel Taft Corp. Hotel Dorset Corp.
Alden Hotel Corp. Bing & Bing, Inc. On April 4, 1955 petitioner opened a checking account, number 021-1-028857, in the name of C.B.P. Kapfer Co., with the Garfield Branch of the Chase Manhattan Bank. During the years in issue petitioner's gross business receipts, as reported on his Federal income tax returns for those years and as described more fully hereinafter, were determined solely by reference to his deposits in this account. In addition, during the period from July, 1952, through July, 1959, petitioner opened four savings accounts, which in form were in petitioner's name "in trust" for his sister, Emma Larios. These savings accounts were all in New York City banks, as follows: date Opened
Bank
Account Number July 17, 1952
Bank for Savings
X X9403
Nov. 22, 1955
Manufacturers Hanover
X X7833
July 10, 1959
Bank for Savings
X X5634
Prior to July 14, 1959
Commercial Bank of North America
XX064J
Deposits in these savings accounts were not considered in calculating petitioner's gross business receipts, as reported on his Federal income tax returns, for the years at issue herein. *114 During the years 1956, 1957, 1958, 1959, and 1960, petitioner from time to time made deposits in his business checking account at Chase Manhattan Bank and the aforementioned savings accounts, as follows: 1956 (a) Checks in the aggregate amount of $15,148.30 from 405 Furniture Corp. to C.B.P. Kapfer Co. were deposited in the business checking account at Chase Manhattan Bank. The record does not disclose what, if any, deposits of checks from other customers were also made in this account during 1956. (b) The following five deposits were made in the original (1952) Bank for Savings account: 1. $100 on February 8, 1956 2. $4,000 on February 17, 1956 3. $3,000 on June 5, 1956 4. $200 on June 15, 1956 5. $200 on June 18, 1956 (c) A total of $14,592.26 was deposited in the Manufacturers Hanover bank account, including: 1. $1,905.75 in checks from 405 Furniture Corp. to C.B.P. Kapfer Co. 2. $659.80 in checks from Alden Hotel Corp. to C.B.P. Kapfer Co. 3. $2,800 in cash, which was transferred from the original Bank for Savings account on June 22, 1956 I1957 (a) A total of $31,488.96 was deposited in the business checking account at Chase Manhattan Bank. *115 (b) The following three deposits were made in the original Bank for Savings account: 1. $900 on January 24, 1957 2. $20 on July 3, 1957 3. $50 on November 13, 1957 (c) A total of $9,975.01 was deposited in the Manufacturers Hanover bank account, including: 1. $3,416 in checks from 405 Furniture Corp. to C.B.P. Kapfer Co. 2. $1,698.85 in checks from Apartment House Decorative Co., Inc. to C.B.P. Kapfer Co. 3. $883.20 in checks from Hotel Taft Corp. to C.B.P. Kapfer Co. 4. $467.66 in checks from Alden Hotel Corp. to C.B.P. Kapfer Co. 5. $108.50 in checks from Bing & Bing, Inc., to C.B.P. Kapfer Co. 6. $451.17 in checks from Hotel Dorset Corp. to C.B.P. Kapfer Co. 1958 (a) A total of $32,486.15 was deposited in the business checking account at Chase Manhattan Bank. (b) The following seven deposits were made in the original Bank for Savings account: 1. $72.00 on April 4, 1958 2. $196.00 on April 23, 1958 3. $236.76 on June 27, 1958 4. $18.86 on June 30, 1958 5. $51.25 on July 23, 1958 6. $172.86 on September 2, 1958 7. $72.00 on October 2, 1958 (c) A total of $15,617.00 was deposited in the Manufacturers Hanover bank *116 account, including: 1. $5,668 in checks from 405 Furniture Corp. to C.B.P. Kapfer Co. 2. $881.24 in checks from Hotel Drake Corp. to C.B.P. Kapfer Co. 3. $1,689.65 in checks from Hotel Taft Corp. to C.B.P. Kapfer Co. 4. $1,507.08 in checks from Bing & Bing, Inc., to C.B.P. Kapfer Co. 5. $884.27 in checks from Alden Hotel Corp. to C.B.P. Kapfer Co. 6. $738.07 in checks from Apartment House Decorative Co., Inc. to C.B.P. Kapfer Co.
7. $440.47 in checks from Hotel Dorset Corp. to C.B.P. Kapfer Co. 1959 (a) A total of $25,452.42 was deposited in the business checking account at Chase Manhattan Bank. (b) The following five deposits were made in the original Bank for Savings account: 1. $72.00 on January 2, 1959 2. $56.00 on March 5, 1959 3. $82.00 on March 26, 1959 4. $36.00 on April 3, 1959 5. $46.00 on July 3, 1959 (c) A total of $16,851.91 was deposited in the Manufacturers Hanover bank account, including; 1. $6,863.75 in checks from 405 Furniture Corp. to C.B.P. Kapfer Co. 2. $2,279.79 in checks from Bing & Bing, Inc. to C.B.P. Kapfer Co. 3. $2,273.14 in checks from Hotel Dorset Corp. to C.B.P. Kapfer Co. 4. $2,112.92 *117 in checks from Hotel Taft Corp. to C.B.P. Kapfer Co. 5. $950.00 in checks from Hotel Drake Corp. to C.B.P. Kapfer Co. 6. $792.46 in checks from Alden Hotel Corp. to C.B.P. Kapfer Co. 1960 (a) A total of $26,653.76 was deposited in the business checking account at Chase Manhattan Bank; (b) The following two deposits were made in the original Bank for Savings account: 1. $19.00 on January 14, 1960 2. $108.00 on April 5, 1960 (c) A total of $19,329.42 was deposited in the Manufacturers Hanover bank account, including: 1. $7,245.25 in checks from 405 Furniture Corp. to C.B.P. Kapfer Co. 2. $3,911.11 in checks from Bing & Bing, Inc. to C.B.P. Kapfer Co. 3. $2,797.10 in checks from Hotel Drake Corp. to C.B.P. Kapfer Co. 4. $2,057.51 in checks from Hotel Dorset Corp. to C.B.P. Kapfer Co. 5. $945.35 in checks from Hotel Taft Corp. to C.B.P. Kapfer Co. 6. $676.62 in checks from Alden Hotel Corp. to C.B.P. Kapfer Co. (d) The following four deposits were made in the Commercial Bank of North America account: 1. $50.00 on January 7, 1960 2. $55.00 on February 10, 1960 3. $100.00 on March 10, 1960 4. $80.00 on April 1, 1960 The following *118 table summarizes the deposits in the savings accounts from 1956 to 1960, inclusive, indicating the amount of those deposits made with checks from customers of C.B.P. Kapfer Co. payable to C.B.P. Kapfer Co., and the remaining, unexplained deposits: 1956
1957
1958
1959
1960 Total Deposits to Savings Accts. with Business Checks
$ 2,565.55
$ 7,025.38
$11,808.78
$15,272.06
$17,632.94
Total Remaining Deposits to Savings Accounts
19,526.71
3,919.63
4,627.95
1,871.85
2,108.48
Total Savings Account Deposits
22,092.26
10,945.01
16,436.73
17,143.91
19,741.42
During the years in issue petitioner received interest payments on the savings accounts. These interest payments were as follows: 1956
1957
1958
1959
1960 Bank for Savings (July, 1952)
$ 22.52
$175.07
$506.27
$400.06
$226.36
Manufacturers Hanover
115.01
181.40
221.54
357.08$235.80
Bank for Savings (July, 1959)
-
-
-
81.59
238.65
Commercial Bank of North America
-
-
-
47.80
65.45
Total Interest
$137.53
$356.47
$727.81
$886.53
$766.26
In or around 1958, his bookkeeper having died, petitioner hired Herman T. Uscott, a certified *119 public accountant, to prepare his tax returns and help with his financial records. At the outset of his employment Uscott met with petitioner at petitioner's place of business. At that time he told petitioner to deposit all of his business receipts into the business checking account and to mail the monthly bank statements to him. Uscott would check the statements as he received them, and would calculate petitioner's gross receipts, for tax purposes, by adding all of the deposits in the checking account. This was the same procedure which had been followed by petitioner prior to his hiring of Uscott. Throughout the years at issue Uscott was unaware of the four savings accounts in petitioner's name "in trust" for his sister. Uscott prepared petitioner's tax returns for 1958, 1959, and 1960 based upon the method they had agreed upon, and he reviewed the 1958 return with petitioner, explaining all of the items thereon. The following table shows petitioner's gross business receipts as reported on his tax returns for the years 1956 to 1960, inclusive, and the total amounts deposited in the business checking account for each of those years: 1956
1957
1958
1959
1960 Gross receipts per return
$34,144.12
$31,517.96
$32,486.15
$25,452.42
$26,653.86
Total amts. deposited in checking account
Total Unknown *
31,488.96
32,486.15
25,452.42
26,653.76
*120 On his Federal income tax returns for the years 1956 to 1960, inclusive, petitioner reported as income only the gross receipts indicated above.He did not report any of the interest payments he received on his four savings accounts. On each return petitioner claimed exemptions for one of his sisters and his mother, as dependents. In addition, he claimed, among others, the following business deductions: 1956
1957
1958
1959
1960 1.Travel and Entertainment
$900.00
$900.00
-
-
-
2.Contributions
400.00
400.00
-
-
-
3.Office Expense
-
400.00
-
-
-
4.Trucking Expense
-
-
$4,416.58
$3,947.50
$4,448.50
5.Outside Work
-
-
3,075.00
-
-
6.Dues and Subscriptions
-
-
413.25
403.91
-
7.Advertising and Subscriptions
-
-
-
-
403.00
8.Selling & Travel
-
-
920.00
920.00
920.00
9.Christmas and Entertaining
-
-
605.00
625.00
625.00
10.Miscellaneous Expenses
300.00
-
-
-
-
*121 For the years 1958, 1959, and 1960 all of these deductions, with the exception of "selling and travel" and "Christmas and entertaining", were computed by Uscott entirely on the basis of canceled checks he received from petitioner. However, for those years the deductions claimed for "selling and travel" and "Christmas and entertaining" contain substantial additions which were not supported by checks or receipts of any kind. In or around 1961 to 1963 Uscott was interviewed by Sidney Buckbinder, a revenue agent, with respect to petitioner's income tax returns for the years 1956 to 1960, inclusive. At that interview Buckbinder told Uscott of the existence of the savings accounts. Uscott then telephoned petitioner, in the presence of Buckbinder, to question him concerning these accounts. Uscott told petitioner that there was a revenue agent in his office who had told him that petitioner had several savings accounts. At first petitioner denied the existence of these accounts, but when pressed by Uscott he finally admitted the existence of one account, and eventually the existence of all four accounts. During this conversation Uscott relayed petitioner's replies to Buckbinder. *122 On March 16, 1964, petitioner was indicted for violations of the Federal income tax laws involving the years 1957 to 1960, inclusive.This indictment arose out of the same transactions involved herein. After a bill of particulars was filed on January 14, 1966, in response to the defendant's motion, the case was dormant until mid-1969, when it was placed upon the trial calendar, and then was finally set for trial in February, 1970. The defendant moved for an order, pursuant to Rule 48(b) of the Federal Rules of Criminal Procedure and the Fifth and Sixth Amendments to the Constitution, that the case be dismissed on the ground that he had been deprived of his right to a speedy trial and that he would be unduly prejudiced by a trial six years after return of the indictment and 10 to 13 years after the tax years involved. On February 13, 1970, the District Court, in an opinion by Judge Motley, granted the motion to dismiss. United States v. Carlos Blanca Perez, 310 F. Supp. 550 (S.D.N.Y.). The Court held that there was an unexcused delay of some four years from the filing of the bill of particulars until trial, that the defendant *123 was prejudiced thereby, and that he had been denied a "speedy" trial as guaranteed by the Sixth Amendment. In reaching the conclusion that the defendant had been prejudiced the Court found that some prospective witnesses who might have given testimony in support of the defendant had either died or left the country since the indictment was returned. Such witnesses included not only the Kapfers, the former owners of the business, one of whom had died and the other of whom was alive in Germany, but also at least several former employees who were either dead or living abroad or who could not be located. The unavailability of these witnesses was of critical importance to the defendant in view of his contention that the Kapfers referred employees to him who worked nights and on weekends on a piece work basis and insisted on being paid in cash, that he believed that he paid these workers in cash and failed to take the deductions for compensation thus paid to them, and that the deductions attributable to such payments would eliminate substantially all, if not all, the alleged unreported income. The Court relied upon these considerations in concluding that the defendant had been prejudiced *124 by the unexcused delay in bringing his case to trial, and it noted in particular that (310 F. Supp. at 552): The government concedes that these is substance to the defendant's claim that certain part time employees, and certain full time employees who worked at night or on weekends, were paid in cash and that these payments may not have been reported by these employees. On November 6, 1970, nearly 10 months after the District Court had dismissed the criminal case, the Commissioner sent his notice of deficiency to petitioner for the years 1956 to 1960, inclusive. In that notice of deficiency he determined that petitioner had unreported income as follows: 1956
1957
1958
1959
1960 Unreported Sales
--
$7,170.63
$14,667.00
$15,272.06
$18,125.94
Unexplained Deposits
19,292.26
2,909.38
1,537.30
1,871.85
1,615.49
Interest on Savings
137.53
356.47
727.81
886.53
766.26
He also disallowed the business deductions claimed by petitioner (set out above) to the following extent: 1956
1957$1958
1959
1960 1. Travel and Entertainment
$900.00
$900.00
-
-
-
2. Contributions
400.00
400.00
-
-
-
3. Office Expense
-
400.00
-
-
-
4. Trucking Expense
-
-
$340.00
$864.00
$984.00
5. Outside Work
-
-
3,075.00
-
-
6. Dues and Subscriptions
-
-
400.00
400.00
-
7. Advertising and Subscriptions
-
-
-
-
400.00
8. Selling and Travel
-
-
920.00
920.00
920.00
9. Christmas and Entertaining
-
-
605.00
625.00
625.00
10. Miscellaneous Expenses
300.00
-
-
-
-
*125 He further disallowed the exemptions claimed by petitioner for his mother and sister for the years 1956, 1957, 1958, and 1959, and for his mother for 1960, stating that petitioner "did not establish that these persons qualified as [his] dependents under section 151 of the Internal Revenue Code of 1954". Finally, the deficiency notice stated "that all or part of the underpayment of tax required to be shown on a return for the taxable years ended December 31, 1956, December 31, 1957, December 31, 1958, December 31, 1959 and December 31, 1960 is due to fraud, therefore the 50 percent addition to the tax provided by section 6653(b) of the Internal Revenue Code of 1954 is asserted for these years". OPINION RAUM, Judge: The deficiency notice in this case was sent long after the expiration of the usual three-year statute of limitations set forth in section 6501(a) of the 1954 Code [1] and therefore this proceeding may be maintained only if the section 6501(c)[2] exception relating to fraud is applicable.The latter provisions lift the bar of the statute of limitations by stating explicitly that the tax may be assessed or a proceeding for *126 its collection may be begun without assessment "at any time" in the case of a "false or fraudulent return with the intent to evade tax". Accordingly, unless the requisite fraudulent intention has been established, this case must be decided in petitioner's favor. For reasons hereinafter set forth, we have concluded that the fraud required by section 6501(c) has not been proven and it therefore becomes unnecessary to consider any of the other issues presented. *127 The burden of proving that petitioner has been guilty of fraud with the intent to evade tax is on the Commissioner (section 7454(a), I.R.C. 1954), and this burden must be carried by "clear and convincing evidence". Rule 142(b), Tax Court Rules of Practice and Procedure; See also W. A. Shaw, 27 T.C. 561, 569, affirmed 252 F.2d 681 (C.A. 6); Arlette Coat Co., 14 T.C. 751, 756. On the record before us we cannot find that the Commissioner has carried that burden. If this case involved merely the necessity of proving that petitioner knowingly omitted items of gross income from his returns, we would have no difficulty in finding, contrary to petitioner's contentions, that the Government had convincingly shown that at the very least the business checks deposited in the savings accounts and the interest on those accounts represented unreported gross income and that petitioner well knew that such income should have been reported. But section 6501(c) calls for something more. It speaks of a false or fraudulent return "with the intent to evade tax". Accordingly, if petitioner had deductions not claimed by him on his returns which could have offset *128 his unreported gross income, a serious question is raised whether he had an "intent to evade tax". For, if petitioner deliberately failed to take deductions to which he was entitled and which might have nullified the effect of his otherwise falsely unreported income, there would then be absent the necessary "intent to evade tax". And if, in the attempt to discharge the burden of proving the necessary "intent to evade tax", it is incumbent upon the Commissioner to show not merely that there was unreported income but also that there were no offsetting deductions, such burden was not carried here. In the ordinary case, it is not open to a taxpayer to conjure up or suggest possible unclaimed deductions and thrust upon the Government the burden of proving the negative that there are no such possible unclaimed deductions that might erase the effect of unreported income. To permit him to do so would in general place an impossible burden upon the Government and plainly would not be in accord with the obvious congressional purpose of providing for the assessment and collection of a deficiency "at any time" in case of fraud. Thus, the general rule is well settled that once the Government *129 establishes the existence of unreported income and allows the deductions claimed on the return, it does not have the further burden of proving the negative that the taxpayer did not have any additional deductions. United States v. Bender, 218 F.2d 869, 871-872 (C.A. 7), certiorari denied 349 U.S. 920; United States v. Stayback, 212 F.2d 313, 317 (C.A. 3), certiorari denied 348 U.S. 911; Clark v. United States, 211 F.2d 100, 103, 104 (C.A. 8), certiorari denied 348 U.S. 911; United States v. Link, 202 F.2d 592, 593-594 (C.A. 3); United States v. Hornstein, 176 F.2d 217, 218 (C.A. 7). We accept the rule of the foregoing cases, but in our judgment the peculiar facts of the case before us call for a different result. On this record there appears to be genuine basis for petitioner's claim that he made cash payments for work performed by his part time employees as well as his regular employees who worked overtime or on weekends. Indeed the District Court found that the Government had "[conceded] that there is substance to the defendant's [petitioner's] claim that certain part *130 time employees, and certain full time employees who worked at night or on weekends, were paid in cash and that these payments may not have been reported by these employees". Obviously, there is much here to suggest that petitioner did in fact have the right to substantial deductions which he did not take. In these circumstances, the effect that such deductions might have upon petitioner's tax liability cannot be ignored. And in the unusual circumstances present here - particularly, the Government's concession in the criminal case - we think it was an essential ingredient of the Government's burden of proving the necessary "intent to evade tax" to establish that petitioner's taxable income (computed by taking into account any deductions that might be allowable by reason of the cash payments to employees) exceeded the taxable income reported by him. Cf. Richardson v. Commissioner, 264 F.2d 400, 405 (C.A. 4), affirming in part and reversing and remanding in part a Memorandum Opinion of this Court; H.J. Feinberg & Co., Inc., 9 T.C.M. 776. Accordingly, since the Commissioner has failed to present any evidence whatever in respect of these deductions we must *131 conclude that he has not carried his burden of proof by "clear and convincing evidence" to establish that petitioner had the requisite "intent to evade tax". We reiterate, however, that we accept the general rule applied in the cases noted above and that the result we reach turns on the special facts of this case. We think it may not be amiss to comment upon the conduct of this litigation. The taxes and additions claimed by the Commissioner in this case are in excess of $64,000, exclusive of interest. Yet, at a preliminary hearing herein petitioner's counsel represented to the Court that petitioner was indigent, that counsel appeared for him without fee and as an accommodation to the Court, and requested that in the circumstances the services of an accountant be provided for him and that a copy of the transcript be furnished to him without charge. [3] In respect thereof there was filed at that time (January 30, 1973) an affidavit of indigency in which petitioner swore that he was without funds, that he had no bank accounts, cash, stocks, bonds, real estate, notes, automobile, or other valuable property, that he had been unemployed for approximately two years, that his brother-in-law *132 provided his food and paid his rent of $72.37 per month, and that his only income was $28 a month which he received from the Veterans Administration. There is nothing before us even to suggest that these representations are inaccurate. It would thus seem highly unlikely that the Government would ever collect any substantial amount from petitioner even if it should prevail in this case. It is difficult to understand its determination in these circumstances to keep carrying its battle relentlessly against him by forcing this case to trial, particularly in the light of the unfortunate history of its litigation with him. Surely, the Government could utilize its limited manpower for more worthwhile purposes, and the Court could devote its efforts to cases that are more likely to be productive of meaningful results. Decision will be entered for the petitioner. Footnotes
*. At the time of the trial herein, the Commissioner's copy of the bank statement for this year had been lost, and another statement from The Chase Manhattan Bank was not available. In respect of 1956, the evidence herein discloses only the deposits, in the aggregate amount of $15,148.30, attributable to checks from one of petitioner's customers. ↩
1. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. ↩
2. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time. (2) Willful attempt to evade tax. - In case of a willful attempt in any manner to defeat or evade tax imposed by this title (other than tax imposed by subtitle A or B), the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time. ↩
3. The Court was obviously in no position to provide him with the services of an accountant, but we understand that respondent arranged to make available to him a copy of the transcript. ↩